**LOCKHEED MARTIN CORPORATION,**
Plaintiff,

v.

The **BOEING COMPANY,** McDonnell Douglas Corporation, Boeing Launch Services, Inc., **William Erskine,** Kenneth Branch, and **Larry Satchell,** Defendants.

No. 6:03CV796ORL28KRS.

United States District Court,
M.D. Florida.
Orlando Division.

Feb. 16, 2005.

See, also, 2005 WL 475395.

Kevin K. Ross, Michael V. Elsberry, Terry C. Young, Richard S. Dellinger, Lowndes, Drosdick, Doster, Kantor & Reed, P.A., Orlando, FL, Michael F. Mason, Peter S. Spivack, Thomas L. McGovern, III, Hogan & Hartson L.L.P., Raymond A. Jacobsen, Jr., McDermott, Will & Emery, Washington, DC, Nathaniel H. Akerman, Dorsey & Whitney, New York, NY, Terrence P. McMahon, McDermott, Will & Emery, Palo Alto, CA, for Plaintiff.

Brad D. Brian, Dennis C. Brown, Gregory D. Phillips, Marc A. Becker, Richard E. Drooyan, Ronald K. Meyer, Munger, Tolles & Olson LLP, Michael W. Fitzgerald, Robert L. Corbin, Sara Pfrommer, Corbin & Fitzgerald, LLP, Los Angeles, CA, David B. King, Mayanne Downs, Thomas A. Zehnder, King, Blackwell & Downs, P.A., Darryl M. Bloodworth, Nichole M. Mooney, Dean, Mead, Egerton, Bloodworth, Capouano & Bozarth, P.A., Orlando, FL, Kara M. Sacilotto, Benjamin S. Sharp, Perkins Coie LLP, Scott M. McCaleb, William J. Colwell, Wiley, Rein & Fielding, LLP Washington, DC, Kristin Linsley Myles, Munger, Tolles & Olson, San Francisco, CA, Gerry S. Gibson, Traci H. Rollins, Steel, Hector & Davis, LLP, West Palm Beach, FL, for Defendants.

Thomas J. Pilacek, Thomas J. Pilacek & Associates, Winter Springs, FL, for Defendants and Claimants.

Jay M. Cohen, Jay M. Cohen, P.A., Winter Park, FL, pro se.

Bernard Barmann, Jr., Ralph Hirschmann, Hirschmann & Barmann LLP, Los Angeles, CA, Robert L. Case, Stovash, Case & Tingley, P.A., Orlando, FL, for Movant.

## ORDER

ANTOON, District Judge.

On April 23, 2004, the Court dismissed Counts I–IV of Plaintiff Lockheed Martin Corporation's ("Lockheed Martin") original Complaint alleging that Defendant The Boeing Company ("Boeing") violated the Racketeer Influenced and Corrupt Organizations Act ("RICO") and the Florida Civil Remedies for Criminal Activities Act ("Florida RICO"). Lockheed Martin has since filed an Amended and Supplemental Complaint ("Amended Complaint") (Doc. 233) alleging violations of RICO and Florida RICO (Counts I–VI) against Boeing and its wholly owned subsidiaries, the McDonnell Douglas Corporation ("McDonnell Douglas") and Boeing Launch Services, Inc. ("BLS"), as well as William Erskine ("Erskine"), Kenneth Branch ("Branch"), and Larry Satchell ("Satchell").

This cause is before the Court on the motions of Boeing and its subsidiaries ("the Boeing Defendants") (Doc. 289)[1] and Satchell (Doc. 315)[2] to dismiss all of the RICO and Florida RICO claims against them. For the reasons set forth below, the motions of the Boeing Defendants and

Satchell (collectively "Defendants") must be granted as to Counts II and V of Lockheed Martin's Amended Complaint. However, while the Boeing Defendants' motion must also be granted as to the remaining counts, Satchell's motion as to those counts must be denied.

## I. Background

Lockheed Martin's RICO claims are premised on allegations that Boeing and certain persons acting for its benefit engaged in misconduct which enabled the company to gain an advantage over its competitors in the market to provide the United States Government ("Government") satellite launch services. In particular, Lockheed Martin alleges that certain individuals, including employees of McDonnell Douglas and Boeing, improperly obtained and used the proprietary and confidential information of Boeing's competitors to gain an advantage in securing satellite launch service contracts from government agencies, including the United States Air Force ("Air Force") and the National Aeronautics and Space Administration ("NASA"). The following facts are taken as true for the purpose of ruling on Defendants' motions.

Beginning in 1992, Lockheed Martin, Boeing, McDonnell Douglas, Alliant, General Dynamics Corporation ("General Dynamics"),[3] and Martin Marietta Corporation ("Martin Marietta") competed for contracts to perform launch services for the Government. From 1992 to April 1993, certain McDonnell Douglas employees including Matthew Jew, an estimating and cost specialist, acquired and used the confidential and proprietary information of

---

1. The Boeing Defendants' motion to dismiss was pled in the alternative to its motion for summary judgment as to the same counts. This Court denied the Boeing Defendants' motion for summary judgment as premature on December 1, 2004. (Doc. 578).

2. Satchell filed a motion to dismiss and joinder in the Boeing Defendants' motion to dismiss.

3. General Dynamics is a predecessor-in-interest to Lockheed Martin.

General Dynamics and Martin Marietta in preparation for McDonnell Douglas's bid on the Air Force's Medium Launch Vehicle III ("MLV–III") procurement. In April 1993, McDonnell Douglas won the MLV–III bid. After acquiring McDonnell Douglas on August 1, 1997, Boeing began providing MLV–III launch services for the Government.

In August 1995, Lockheed Martin, Boeing, McDonnell Douglas, and Alliant Techsystems, Inc. ("Alliant") began designing, proposing, and building Evolved Expendable Launch Vehicle ("EELV") systems for the Government. All four corporations initially competed in a multi-phased EELV competition held by the Air Force, the object of which was to provide the Government with the best and most innovative launch services at the best value. On December 20, 1996, after receiving proposals for the "Pre–Engineering and Manufacturing Development phase" of the EELV competition, the Air Force made a "downselect" decision, reducing the number of EELV competitors from four to two, resulting in the elimination of Boeing and Alliant from the competition. Boeing reentered the EELV competition when it acquired McDonnell Douglas in August 1997.

On November 3, 1997, the Air Force adopted a new competition strategy which, among other things, required Lockheed Martin and Boeing to bid for contracts to provide launch services for an initial set of thirty Government launch missions. In crafting its bid proposal for this competition, Boeing's EELV team, comprised of Branch, Erskine, Satchell, and Tom Alexiou ("Alexiou"), relied on the confidential and proprietary information of Lockheed Martin. Jew also participated in preparing Boeing's proposal by performing parametric analyses on the information unlawfully obtained from Lockheed Martin. On October 16, 1998, the Air Force awarded

its first set of EELV contracts. Of the twenty-eight EELV contracts awarded, Boeing received nineteen and Lockheed Martin received nine.

The confidential and proprietary information used by Boeing's EELV team and Jew to prepare Boeing's bid for the October 1998 competition was supplied by Branch and Allen Cantu, Inc. ("Allen Cantu"). Branch initially provided Boeing with information in August 1996 while he was employed by Lockheed Martin, and he continued to do so until the conclusion of his employment with Lockheed Martin on January 29, 1997. Upon the termination of his employment with Lockheed Martin, Branch commenced employment with Boeing. In the months leading up to the October 1998 competition, Branch provided Boeing with additional confidential and proprietary information relating to Lockheed Martin's EELV proposal. Allen Cantu, an engineering firm, came to possess Lockheed Martin proprietary and confidential information while serving as "oversight officials" for one of the company's launch pads. Boeing hired Allen Cantu for the purpose of acquiring such information, which Allen Cantu provided to Boeing from August 1996 to June 1998.

In July 2001, Boeing hired Richard Hora ("Hora") to prepare competitive assessments for Boeing's Space & Communications Group. In preparing cost assessments for Boeing in connection with three NASA procurements, Hora relied on Lockheed Martin confidential and proprietary information, which Hora had obtained while he was an employee of General Dynamics.

In addition to improperly obtaining and using the confidential and proprietary information of Boeing's competitors, Defendants and others who committed abuses for Boeing's benefit hid and otherwise misrepresented the scope and gravity of their

wrongdoing. In June 1999, Boeing informed Lockheed Martin that certain of its employees had possessed Lockheed Martin confidential and proprietary information. However, from the time of Boeing's initial disclosure until at least October 2003, Boeing intentionally and severely understated the quantity and value of such information.

Boeing and its employees, particularly Satchell, also engaged in more affirmative efforts to cover up Boeing's wrongdoing. Sometime in the summer of 1999, Satchell asked Jew to retrieve and destroy documents containing stolen Lockheed Martin confidential and proprietary information and the results of any analysis that Jew based on such information. Jew complied by destroying original physical documents containing Lockheed Martin information as well as two electronic copies of competitive analysis based on the stolen information. Additionally, on December 18, 2001, in a wrongful termination suit brought by Branch and Erskine against Boeing (the "Erskine litigation"), Satchell falsely testified that he never shared any Lockheed Martin confidential or proprietary information with anyone. In the same case, Boeing submitted a false affidavit which, among other things, disclaimed any knowledge of "improprieties in the ... EELV bid process." Finally, on June 10, 2003, Boeing provided the Air Force with a report which contained a false and misleading sworn declaration by Jew that he did not perform competitive assessments of Lockheed Martin's likely proposal for the 1998 EELV competition.[4]

## II. Standard for Motion to Dismiss for Failure to State a Claim

To warrant dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, it must be "clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Blackston v. Alabama*, 30 F.3d 117, 120 (11th Cir.1994) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)). In determining whether to grant a motion to dismiss, a court must accept all the factual allegations in the complaint as true and consider all reasonable inferences derived therefrom in the light most favorable to the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Jackson v. Okaloosa County, Fla.*, 21 F.3d 1531, 1534 (11th Cir.1994); *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1484 (11th Cir.1994).

## III. Legal Discussion

In its Amended Complaint, Lockheed Martin has alleged three categories of RICO claims. First, in Counts I and IV, Lockheed Martin alleges that Defendants violated 18 U.S.C. § 1962(c) and § 772.103(3), Florida Statutes, by conducting and participating in the conduct of four enterprises through a pattern of racketeering activity, which included acts of bribery chargeable under state law and punishable by imprisonment for more than one year as well as acts indictable under 18 U.S.C. §§ 1341 (relating to wire fraud), 1343 (relating to mail fraud), 1503 (relating to obstruction of justice), 1512 (relating to tampering with a witness, victim, or informant), 2314, and 2315 (relating to interstate transportation of stolen property). In Counts II and V, Lockheed Martin alleges that Defendants violated 18 U.S.C. § 1962(a) and § 772.103(1), Florida Statutes, by receiving income from a pattern of racketeering activity which they used and invested in the establishment and op-

---

**4.** A more elaborate recitation of the facts is contained in this Court's April 23, 2004 Memorandum and Order denying a prior motion to dismiss by Defendants Boeing, William Erskine, Kenneth Branch, and Larry Satchell. Doc. 207, Memorandum and Order, April 23, 2004, *Lockheed Martin Corp. v. Boeing Co.*, 314 F.Supp.2d 1198 (M.D.Fla.2004).

eration of Boeing. Finally, in Counts III and VI, Lockheed Martin alleges that Defendants violated 18 U.S.C. § 1962(d) and § 772.103(4), Florida Statutes, by conspiring to violate §§ 1962(a) and 1962(c) and §§ 772.103(1) and 772.103(3), Florida Statutes.[5]

The Boeing Defendants raise the following arguments on their motion to dismiss Lockheed Martin's RICO claims: (1) that Counts I and IV should be dismissed because Lockheed Martin has failed to properly allege a RICO enterprise and because Lockheed Martin has failed to sufficiently allege that the Boeing Defendants operated or managed either of the two alleged criminal association-in-fact enterprises; (2) that Counts II and V should be dismissed because Lockheed Martin has failed to sufficiently allege that the Boeing Defendants received income directly or indirectly from racketeering activity or that the Boeing Defendants invested the proceeds of such income in a RICO enterprise; (3) that Counts III and VI should be dismissed because there is no merit to the claims underlying Lockheed Martin's conspiracy claim and because Lockheed Martin has failed to allege an injury resulting from overt acts committed in furtherance of the conspiracy; and (4) that Counts I–VI should all be dismissed because Lockheed Martin has failed to properly allege predicate acts sufficient to constitute a pattern of racketeering activity.

Satchell's arguments for dismissal are identical to those raised by the Boeing Defendants except that Satchell concedes that Lockheed Martin has already succeeded in alleging an enterprise against him in its claims under § 1962(c) and § 772.103(3), Florida Statutes. Satchell instead rests his argument for dismissal of these claims on his contention that Lockheed Martin has failed to allege a pattern of racketeering activity.

## A. The Boeing Defendants' Motion to Dismiss Counts I and VI

Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." To state a claim under § 1962(c), Lockheed Martin must allege that the Boeing Defendants: (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that must include at least two racketeering acts. *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985); *Reves v. Ernst & Young,* 507 U.S. 170, 178–79, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) (setting forth the " 'operation or management' test").

Lockheed Martin has alleged the existence of four RICO enterprises: 1) a legitimate association-in-fact comprised of the Air Force, Lockheed Martin, Boeing, McDonnell Douglas, BLS, and Alliant, joined together for the common purpose of designing, proposing, and building the most innovative EELV systems for the Government at the best value; 2) a legitimate association-in-fact comprised of the Air Force, Lockheed Martin, Boeing, McDonnell Douglas, BLS, and Alliant, as well as NASA, Matthew Jew, General Dynamics, and Martin Marietta, also joined together for the purpose of designing, proposing, and building the most innovative EELV systems for the Government at the best value; 3) a criminal association-in-fact

---

**5.** For the purposes of ruling on Defendants' motions, analysis of Lockheed Martin's claims under RICO applies with equal force to its corresponding claims under Florida RICO. *See Gross v. State,* 765 So.2d 39, 42–43 (Fla. 2000).

consisting of Erskine, Satchell, Branch, and other Boeing employees, including Tom Alexiou, joined together for the common purpose of stealing the confidential and proprietary information of the Boeing's competitors; and 4) a criminal association-in-fact consisting of McDonnell Douglas, Launch Services Subsidiary, Boeing, Hughes, Allen Cantu, Branch, Erskine, Satchell, Alexiou, Black, Hora, and others known and unknown, also joined together for the purpose of stealing the confidential and proprietary information of Boeing's competitors.

The Boeing Defendants' principal contention in moving to dismiss Lockheed Martin's claim under § 1962(c) is that Lockheed Martin fails in each of its attempts to allege the existence of a RICO enterprise. Additionally, the Boeing Defendants argue that Lockheed Martin fails to sufficiently allege that they operated or managed the affairs of the alleged legitimate enterprises. As explained below, the Court finds no merit in the Boeing Defendants' argument that Lockheed Martin's allegations of legitimate enterprises fail under the "operation or management" test. Nevertheless, the Court agrees with the Boeing Defendants that Lockheed Martin's § 1962(c) claim against them must be dismissed for failure to properly allege a RICO enterprise.

### 1. Operation or Management

■ The "operation or management" test established by the Supreme Court in *Reves* requires a plaintiff to adequately allege that the defendant had "some part in directing [the] affairs" of the alleged enterprise. *United States v. Starrett*, 55 F.3d 1525, 1542 (11th Cir.1995) (quoting *Reves*, 507 U.S. at 183, 113 S.Ct. 1163). Thus, "RICO liability is not limited to those with primary responsibility for the enterprises" nor even the "upper management" of the enterprises but may be assigned to those who simply "exert control over" the enterprises. *Id.* Even "[o]utsiders may exert control over an enterprise's affairs through illegal means sufficient to satisfy" the "operation or management" test. *United States v. Castro*, 89 F.3d 1443, 1452 n. 5 (11th Cir.1996).

■ The Boeing Defendants contend that, at most, they merely *influenced* the alleged legitimate enterprises to make certain decisions in Boeing's favor. Lockheed Martin, however, submits that, "by stealing and using Lockheed Martin … confidential and proprietary information," the Boeing Defendants exerted *control* over the bidding processes for satellite launch contracts with the Government, and thereby caused the Government to grant contracts to Boeing.

In *Castro*, the Eleventh Circuit found that a group of lawyers " 'agreed' to affect the operation or management" of a state circuit court by paying kickbacks to judges who appointed the lawyers as special assistant public defenders. 89 F.3d at 1447–48. The lawyers were "outsiders" in the sense that they did not work for the court and had no formal decision-making authority over which lawyers received the public defender appointments. *See id.* at 1447–48, 1452. Nevertheless, the court deemed the lawyers' kickbacks to the judges sufficient to satisfy the *Reves* "operation or management" test. *Id.* at 1452.

Lockheed Martin's allegations of "control" bear a strong resemblance to the facts in *Castro*. In this case, the Boeing Defendants were not primarily responsible for determining which companies received launch contracts. Yet, like the defendants in *Castro*, they are alleged to have engaged in illegal activity which substantially impacted the decisions of those who did have principal decision-making authority. The only difference in this case is that the decision-makers were neither aware of, nor complicit in, the alleged scheme. This is a distinction, however, that is irrelevant

to the question of whether the Boeing Defendants controlled the alleged legitimate enterprises through their illegal conduct.

In *Castro,* the Eleventh Circuit, in support of its determination that "[o]utsiders may exert control over an enterprise's affairs," cited *Aetna Casualty Surety Co. v. P & B Autobody,* 43 F.3d 1546, 1559–60 (1st Cir.1991), for its finding that "claimants who submitted fraudulent claims to [an] insurance company [and] caused the insurance company to pay out large sums of money ... exerted sufficient control over [the] affairs of the insurance company to satisfy the dictates of *Reves.*" 89 F.3d at 1452. Considering the Eleventh Circuit's approval of *Aetna,* it seems unlikely that the court would have altered its conclusion in *Castro* had it found that the lawyers had deceived, rather than bribed, the judges in order to obtain the public defender appointments. *See id.*

Similarly, the issue here is not the means that the Boeing Defendants employed to impact the Government's decisions or whether the Government was aware of the Boeing Defendants' illegal conduct, but whether it can reasonably be inferred from the facts alleged in Lockheed Martin's Amended Complaint that the Boeing Defendants exercised some measure of control over the awarding of launch contracts. Lockheed Martin has satisfied that burden. Much as there was a cause and effect relationship between the kickbacks and public defender appointments in *Castro,* the Boeing Defendants' illegal activity, as alleged in this case, enabled Boeing to secure contracts that it would not have otherwise obtained. In this way, the Boeing Defendants controlled the outcome of the bidding competitions for launch contracts. Accordingly, Lockheed Martin's claims of legitimate associations-in-fact satisfy the "operation or management" test.

**2. RICO Enterprise**

■ RICO defines an "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The Supreme Court has interpreted this language broadly to embrace not only legal entities but also "illegitimate associations-in-fact." *Russello v. United States,* 464 U.S. 16, 24, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983); *see also United States v. Turkette,* 452 U.S. 576, 580–83, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). An association-in-fact "can exist in the absence of a formally structured group," *United States v. Young,* 906 F.2d 615, 619 (11th Cir.1990), including even "a myriopod criminal network, loosely connected but connected nonetheless." *United States v. Elliott,* 571 F.2d 880 (5th Cir.1978).[6] The critical determination in evaluating whether "an association of individual entities" constitutes "a RICO enterprise" is whether "the association of individual entities, however loose or informal, ... furnishe[d] a vehicle for the commission of two or more predicate crimes." *United States v. Goldin Indus., Inc.,* 219 F.3d 1271, 1275 (11th Cir.2000) (hereinafter *"Goldin II"*).

**a. Lockheed Martin's Allegations of Legitimate Association–in–Fact Enterprises**

■ The Boeing Defendants primarily argue that Lockheed Martin's allegations of legitimate association-in-fact enterprises fail because the entities which comprise the alleged enterprises do not satisfy the

---

**6.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to September 30, 1981.

requirement that associations-in-fact be "associated together for the common purpose of engaging in a course of conduct." *Turkette*, 452 U.S. at 583, 101 S.Ct. 2524. The Boeing Defendants contend that, quite apart from "working together for any common purpose," the entities comprising both alleged legitimate enterprises were "vigorous competitors." Thus, the Boeing Defendants conclude, "the mere fact that the alleged 'associates' were involved in government-sponsored programs cannot establish a 'common purpose' among the alleged associates." Doc. 289 at 5.

In response to the Boeing Defendants' argument, Lockheed Martin focuses on two issues. First, Lockheed Martin em-phasizes that a RICO enterprise can be either criminal or legitimate. Second, Lockheed Martin contends that an association-in-fact can include entities with conflicting interests. Neither of these arguments, however, addresses the core issue raised by the Boeing Defendants, which is whether the entities alleged to constitute the claimed legitimate enterprises "associated together for the common purpose of engaging in a course of conduct."

For the purposes of addressing the Boeing Defendants' argument, it is accepted as true that Boeing and its competitors each sought to provide the government with quality satellite launch services at the best possible value.[7] Yet, while this fact would

---

7. This determination is reached despite considerable doubts about both the factual and legal plausibility of Lockheed Martin's allegations. First, as a factual matter, it seems unlikely that the purpose of Boeing or its competitors was to provide the Government with satellite launch services at the best possible value. While the bidding competitions may have had the effect of reducing costs for the Government, this is not the same as saying that the competing companies sought to provide services at the best value. It is no small strain on the imagination to think, for example, that, had the Air Force offered to pay one of the competing companies more for a contract than what the company considered to be the best value to the Government, the company would have insisted on performing the contract for less than what the Government offered. Moreover, Lockheed Martin's allegation of "common purpose" is belied by its antitrust claims, which allege that Boeing sought to exclude its competitors so that it could raise its prices and thereby increase its profits.

Additionally, there is a question as to whether there is, or should be, a requirement that the purpose binding together an association-in-fact be an illegitimate or criminal one. The Supreme Court in *Turkette* held that a RICO enterprise could be an "exclusively criminal" association-in-fact but did not decide whether an association-in-fact *had* to be comprised of criminals (or at least be formed for an illegitimate purpose). 452 U.S. at 580,

101 S.Ct. 2524. Later statements of *Turkette*'s holding, however, suggested that RICO may require that enterprises be comprised of either *"legal entities"* or *"illegitimate associations-in-fact."* See, e.g., *Russello v. U.S.*, 464 U.S. 16, 24, 104 S.Ct. 296 (citing *Turkette*, 452 U.S. at 589, 101 S.Ct. 2524) (emphasis added); *see also U.S. v. Cianci*, 378 F.3d 71, 79 (1st Cir.2004) ("'[E]nterprise' has been interpreted *inter alia* to include (1) legal entities such as legitimate business partnerships and corporations and (2) illegitimate associations-in-fact marked by an ongoing formal or informal organization of individual or legal entity associates ... who or which function as a continuing organized crime unit 'for a common purpose of engaging in a course of conduct.'") (citations omitted); *Emery v. Am. Gen. Fin., Inc.*, 134 F.3d 1321, 1322 (7th Cir.1998) (Posner, J.) (stating that an "association in fact" is a "a polite name for a criminal gang or ring"); *United States v. Castro*, 89 F.3d 1443, 1459 (11th Cir.1996) (equating, parenthetically, an "association-in-fact" with "an enterprise specifically formed for illegal purposes"); *Moll v. U.S. Life Title Ins. Co. of New York*, 654 F.Supp. 1012, 1031 (S.D.N.Y. 1987) (stating that, in the Second Circuit, "for an association of individuals to constitute an 'enterprise' for purposes of RICO, the individuals must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes"). *But see* G. Robert Blakey & Brian Gettings, *Racketeer Influenced and Corrupt Organizations (RICO): Basic Concepts–Criminal*

be sufficient to establish that there was a purpose commonly shared by Boeing and its competitors, it does not follow that Lockheed Martin has succeeded in satisfying the "common purpose" requirement for pleading a RICO enterprise. Rather, to meet this requirement, Lockheed Martin must allege, not only that there was some commonly shared purpose among Boeing and its competitors, but also that they *associated together* for that purpose.

To decide whether Boeing and its competitors associated together, it is critical to determine, first, what it means to "associate" or to be "associated." RICO does not define these terms, and a search has failed to yield any cases which directly endeavor to define them insofar as they relate to an association-in-fact. As such, the only resort is to accord the terms their "ordinary meaning" consistent with a reasonable interpretation of RICO. *Goodlin v. Medtronic, Inc.,* 167 F.3d 1367, 1374 (11th Cir. 1999). "To determine the common usage or ordinary meaning of a term, courts often turn to dictionary definitions for guidance." *Anderson v. UNUM Provident Corp.,* 369 F.3d 1257, 1264 (11th Cir.2004) (citations and internal quotation marks omitted).

According to Webster's, "associate" means "to come together as partners" or "to combine or join together." Merriam–Webster's Collegiate Dictionary (10th ed.1999) (intransitive form). If the parties'

own pleadings are any indication, this definition is consonant with the ordinary meaning and usage of "associate." While Lockheed Martin alleges that Boeing and its competitors *joined together* for a common purpose, the Boeing Defendants contend that they "never *worked together* for any common purpose." (emphasis added). The point, of course, is not the parties' disagreement but their use of nearly identical terminology in contexts in which they might have just as readily employed "associated together." Similarly, although the Court can find no case which squarely confronts the definition of "associate," some courts have used the phrases "worked together" or "joined together" synonymously with "associated together." *United States v. Connolly,* 341 F.3d 16, 26 (1st Cir.2003) (finding that individuals could constitute an association-in-fact where they *"worked together* ... over a period of almost two decades, *joining forces* to protect themselves from prosecution and to further other criminal activities") (emphasis added); *U.S. v. Bagaric,* 706 F.2d 42, 56 (2d Cir.), *cert. denied,* 464 U.S. 840, 104 S.Ct. 134, 78 L.Ed.2d 128 (1983) (noting "the common sense recognition [by courts] that a group of individuals may *join together,* and, therefore, be associated in fact") (emphasis added); *Moll v. U.S. Life Title Ins. Co. of New York,* 654 F.Supp. 1012, 1032 (S.D.N.Y.1987) (dismissing RICO claim for failure to specify

*and Civil Remedies,* 53 Temp. L.Q. 1009, 1025 (1980) ("Associations in fact are often formed for the purpose of engaging in criminal activities, but their purposes may be legitimate as well.") (footnote omitted) (citing S.Rep. No. 617, 91st Cong., 1st Sess. 158 (1969)).

It is unclear whether some rationale, consistent with RICO's purpose, exists for using the statute to reach an association-in-fact with a legitimate purpose. Because the Court rejects Lockheed Martin's claims of legitimate associations-in-fact on a separate basis, it need not decide this difficult issue today. The Court notes, however, that Lockheed Martin's

allegations appear to fall outside the categories of concern described by the court in *Turkette.* That is, it would seem that targeting entities bound together by a legitimate purpose would neither: (1) "cope with the infiltration of legitimate businesses"; nor (2) deal with the problem of organized crime "at its very source." 452 U.S. at 591, 101 S.Ct. 2524 ("Accepting that the primary purpose of RICO is to cope with the infiltration of legitimate businesses, applying the statute in accordance with its terms, so as to reach criminal enterprises, would seek to deal with the problem at its very source.").

how members of alleged association-in-fact *"joined together* as a group" to achieve a common purpose) (emphasis added).

Besides the consistency of Webster's definition with the ordinary usage of "associate," it also offers a clarity that alternative definitions lack. American Heritage, for example, defines "associate" as "[t]o join in or form a league, union, or association". American Heritage Dictionary of the English Language (4th ed.2000). This definition, as contrasted with Webster's, assumes the very thing which is at issue here-*the existence of an association*-and fails, moreover, to indicate what type of relationship the associating entities must have with one another.[8]

■ As Lockheed Martin's claims illustrate, the concern for clarity is more than merely academic. In essence, Lockheed Martin argues for an interpretation of "associate" that would effectively negate the enterprise requirement in any case in which competitors are alleged to comprise an association-in-fact. First, given that the relationship between Boeing and its competitors consisted of only their participation in bidding competitions for government contracts, the first logical implication of Lockheed Martin's approach is that competitors in any given bidding competition are presumptively "associated." However, the breadth of Lockheed Martin's approach does not, as a matter of logic, end there. Rather, absent any principled means of distinguishing between partic-

ipation in a bidding competition and other forms of market participation (and Lockheed has proffered none), competitors in *any* market would be deemed "associated." To take the final step of alleging that the competitors were not only "associated" but "associated together for [a] common purpose" would demand only that plaintiffs, *a la* Lockheed Martin, plead the obvious-that competitors in a given market seek to produce a certain product or satisfy a common class of consumers. There is simply no cause to invite such an expansive application of RICO. Requiring instead that there be a joining together of alleged associated-in-fact entities comports with the plain definition of "associate" at the same time that it guards against overreaching by creative plaintiffs. Moreover, this requirement stops well short of adopting anything like a formal structure requirement. Rather, associated-in-fact entities may be "joined together" formally or informally, so long as their association "furnishes a vehicle for the commission of two or more predicate crimes." *Goldin II*, 219 F.3d at 1275.

Under the standard now adopted, Lockheed Martin's claims of legitimate enterprises clearly fail. Far from joining or working together in contests for government contracts, Boeing and its competitors were *competing* for contracts.[9] They were, in other words, "acting *independently* to secure the business of a third party." Merriam–Webster's Collegiate Dictionary (10th ed.1999) (defining competition) (em-

---

8. These difficulties are not resolved by turning to the definition of "association." American Heritage defines "association" as either "[t]he act of associating or the state of being associated" or "[a]n organized body of people who have an interest, activity, or purpose in common." American Heritage Dictionary of the English Language. The first definition is obviously of no use in this instance, and the second fails to indicate how the associated entities must be organized-in other words, what their relationship to each other must be.

9. This is not to suggest that competitors can never "associate" or "join together." Rather, not only is it theoretically possible, but it is something that, as a practical matter, often occurs. *See, e.g.*, Forbes, Rita Koselka, *Evolutionary Economics: Nice Guys Don't Finish Last*, October 11, 1993, at 10 (noting that "joint ventures are a prime example of competitors cooperating"). It is quite another thing, however, to allege, as Lockheed Martin does, that competitors have joined together or have combined as partners *in a competition*.

phasis added).[10] If anything, then, the relationship between Boeing and its competitors present a paradigmatic case of what is *not* an association-in-fact under RICO.

◼ A secondary argument raised by the Boeing Defendants is that Lockheed Martin's allegations of legitimate enterprises fail because corporations and government agencies cannot be associated in fact under RICO. Relying in part on language in *United States v. Hartley*, the Boeing Defendants contend, as a matter of statutory interpretation, that the use of "individual" in RICO's definition of "enterprise" refers only to a living person. 678 F.2d 961, 989 (11th Cir.1982) ("Section 1961(3) defines 'person' as 'any individual or entity capable of holding a legal or beneficial interest in property.' It is clear from the definition that 'individual' is used differently from 'person' in the act to connote a living person."), *rev'd on other grounds, United States v. Goldin Industries, Inc.*, 219 F.3d 1268, 1271 (11th Cir. 2000) ("*Goldin I*"); *see also Lockheed Martin*, 314 F.Supp.2d at 1216 ("This theory that Congress did not have corporations in mind when it wrote the second half of section 1961(4) is buttressed by the fact that corporations necessarily fall within the first half of the definition. So does the often-repeated theory that the second part of the definition of enterprise was designed to snare not 'duly formed corporation[s] that elect[ ] officers and hold[ ] annual meetings,' but 'amoeba-like infra-structure[s] that control[ ] secret criminal networks.'") (citations omitted) (discussing the view set forth by the court in *Hartley* ).

Since *Hartley*, the trend has clearly been in favor of permitting associations-in-fact to include corporations. *United States v. Navarro–Ordas*, 770 F.2d 959 (11th Cir.1985) (three-judge panel rejected defendant's argument that the indictment against him "failed to describe a RICO 'enterprise'" because "it only alleged that the enterprise consisted of a group of corporate entities rather than living persons" and found that "a group of corporations can be a 'group of individuals associated in fact' within the meaning of the 'enterprise' definition of 18 U.S.C. § 1961(4)"); *U.S. v. Blinder*, 10 F.3d 1468, 1473 (9th Cir.1993); *United States v. London*, 66 F.3d 1227, 1243 (1st Cir.1995); *United States v. Console*, 13 F.3d 641, 652 (3d Cir.1993); *Atlas Pile Driving Co. v. DiCon Fin. Co.*, 886 F.2d 986, 995 n. 7 (8th Cir.1989); *United States v. Perholtz*, 842 F.2d 343, 353 (D.C.Cir.), *cert. denied*, 488 U.S. 821, 109 S.Ct. 65, 102 L.Ed.2d 42 (1988); *United States v. Huber*, 603 F.2d 387, 394 (2d Cir.1979); *see also Goldin II*, 219 F.3d at 1276 (finding that an association of corporations constituted an association-in-fact RICO enterprise without expressly addressing the issue of whether a non-living person may be part of an association-in-fact). However, despite the weight of authority favoring the view that associations-in-fact may be comprised of corporations, *Hartley* controls under the Eleventh Circuit's prior precedent rule. *Cf. Hartley*, 678 F.2d 961, 989 (11th Cir.1982); *Navarro–Ordas*, 770 F.2d 959 (11th Cir.1985). That rule holds that, where there is intra-circuit conflict, "the earliest panel opinion resolving the issue in question binds the circuit until the court resolves the issue *en banc*." *U.S. v. Dailey*, 24 F.3d 1323, 1327 (11th Cir.1994). While *Hartley* was overruled by an *en banc* court in *Goldin I*, the court did not address the issue of whether associations-in-fact may be comprised of corporations or other non-living entities.

---

**10.** In fact, Lockheed Martin not only alleges that Boeing competed for Government contracts but also that it engaged in a pattern of unethical and illegal conduct for the purpose of driving its competitors out of the market.

219 F.3d at 1271 (overruling *Hartley*'s determination that distinctness between a RICO person and a RICO defendant was not required). Thus, *Hartley* remains good law at least to the extent that it held that an association-in-fact may not be comprised of non-living persons. Accordingly, Lockheed Martin's claims of legitimate associations-in-fact fail for the additional reason that they are alleged to include corporations and government agencies.

### b. Lockheed Martin's Allegations of Criminal Association–in–Fact Enterprises

■ The Boeing Defendants argue that Lockheed Martin's allegations of criminal associations-in-fact fail because the entities which comprise them are not sufficiently distinct from the Boeing Defendants to satisfy the distinctness requirement adopted by the Eleventh Circuit in *Goldin I*. In *Goldin I*, the Eleventh Circuit joined its sister circuits in requiring plaintiffs alleging claims under § 1962(c) to "name a RICO person distinct from the RICO enterprise." 219 F.3d at 1271. Determining whether a RICO defendant is sufficiently distinct from an alleged RICO enterprise is "a fact-intensive inquiry that is not driven solely by formal legal relationships among the alleged 'associates-in-fact.'" 314 F.Supp.2d at 1212 (citing *Cedric Kushner Promotions, Ltd. v. Don King*, 533 U.S. 158, 121 S.Ct. 2087, 150 L.Ed.2d 198 (2001); *Goldin II*, 219 F.3d at 1277; *Riverwoods Chappaqua Corp. v. Marine Midland Bank*, 30 F.3d 339, 344 (2d Cir.1994)). The crucial factor is whether each entity alleged to be part of the association-in-fact "is free to act independently and advance its own interests contrary to those" of the other entities. *Goldin II*, 219 F.3d at 1277.

This Court previously found that Boeing, Satchell, Erskine, Branch, and Boeing's EKV and EELV teams (collectively alleged as the "Boeing Trade Services Theft Enterprise" ("BTSTE")) were not sufficiently distinct from Boeing to constitute a RICO enterprise in Lockheed Martin's § 1962(c) claim against Boeing.[11] Critical to the Court's analysis was its determination that none of the entities or persons comprising the BTSTE was alleged to have operated independently of Boeing.

The Boeing Defendants contend that neither of Lockheed Martin's newly alleged criminal associations-in-fact can withstand the reasoning of the prior order. Lockheed Martin appears to concede as much with respect to the first alleged criminal association-in-fact[12] but argues

---

**11.** Lockheed Martin's allegation of the BTSTE did, however, survive in Lockheed Martin's claims against Defendants Erskine, Satchell, and Branch.

**12.** In its opposition to the Boeing Defendants' motion, Lockheed Martin contends the following:

> Boeing's attack on Criminal Enterprise # 1 misapprehends its significance in [the Amended Complaint]. As Boeing notes, Criminal Enterprise # 1 is identical to the initial complaint's "Boeing Trade Secrets Theft Enterprise" ("BTSTE"), but without Boeing. The Court allowed a RICO claim against Boeing employees, Satchel [sic], Erskine and Branch as members of BTSTE.

Thus, one reason Criminal Enterprise # 1 is in the [Amended Complaint] is to assert RICO claims against those individuals, based on allegations the Court has already determined to be sufficient.
> Boeing is also liable for Criminal Enterprise # 1 .... Count XXIX [of the Amended Complaint] pleads Boeing's *respondeat superior* liability for, *inter alia*, RICO claims against Satchel [sic], Erskine and Branch .... Thus, Criminal Enterprise # 1 is also a basis for ascribing RICO liability to Boeing itself.

Doc. 338 at 9 (citations omitted). Missing from Lockheed Martin's contention is any discussion of the Boeing Defendants' argument regarding the deficiencies of "Criminal Enterprise # 1" as alleged in Lockheed Martin's

that the inclusion of Allen Cantu, McDonnell Douglas, and Hughes in the second of its alleged criminal associations-in-fact renders it sufficiently distinct from Boeing.

Under the reasoning of the prior order, Lockheed Martin's first alleged criminal enterprise cannot stand. First, as the Boeing Defendants contend, the deletion of Boeing and Boeing's EELV and EKV proposal teams fails to cure the "fundamental distinctness problem" which the BTSTE posed. The Court's earlier rejection of the BTSTE was premised as much on the indistinctness of Satchell, Erskine, and Branch as on that of Boeing and its launch proposal teams.

The sole difference between Lockheed Martin's presently alleged association-in-fact and the BTSTE is that, now, Branch is no longer alleged to have been acting on Boeing's behalf. However, even had Branch acted independently of the Boeing Defendants when he was not yet a Boeing employee, his inclusion in the alleged enterprise would not alone render the enterprise distinct. In rejecting Lockheed Martin's contention that Branch rendered the BTSTE distinct from Boeing, the earlier order reasoned that:

> Not only was Branch himself not "sufficiently distinct" from Boeing during the five months before he became an actual employee, *those five months did not morph the allegedly years-long BTSTE, which would otherwise clearly be a corporate enterprise indistinct from Boeing, into something separate from Boeing.*

314 F.Supp.2d at 1215 (emphasis added). In other words, even if Branch had somehow been distinct during the five months before he began working for Boeing, this would not have rendered Boeing and the BTSTE distinct. Lockheed Martin's first alleged criminal association-in-fact is, therefore, not sufficiently distinct from the Boeing Defendants to constitute a RICO enterprise.

The only pertinent distinction between the second of Lockheed Martin's alleged criminal associations-in-fact and the first is that the second alleged association-in-fact also includes Allen Cantu, McDonnell Douglas, and Hughes, all of which Lockheed Martin alleges were distinct from Boeing at one time. The Boeing Defendants argue first, with respect to Allen Cantu, that, as a consulting firm hired by Boeing to steal trade secrets, it was an agent of Boeing and was, therefore, indistinct from the Boeing Defendants. Regarding Hughes and McDonnell Douglas, the Boeing Defendants argue that Lockheed Martin fails to allege that the two companies associated with Boeing during the period in which they were distinct from Boeing.

As an initial matter, the Court rejects the Boeing Defendants' argument that Boeing and Allen Cantu were indistinct. There is nothing in Lockheed Martin's Amended Complaint which indicates that

---

claim against the Boeing Defendants under Count I.

It does not appear that the Boeing Defendants necessarily misapprehended the significance of Lockheed Martin's allegation of "Criminal Enterprise # 1." Count I is, after all, alleged against "All Defendants." The Boeing Defendants do, however, make the mistake of arguing the adequacy of Lockheed Martin's *respondeat superior* claim in their reply to Lockheed Martin's opposition. The

Boeing Defendants only moved to dismiss Counts I–VI of Lockheed Martin's Amended Complaint; thus, the Court does not have occasion to address the adequacy of Lockheed Martin's claims in Count XXIX. Also, it is important to note that the Court's finding that "Criminal Enterprise # 1" is not sufficiently distinct from the Boeing Defendants has no bearing on Lockheed Martin's claims against Satchell, Erskine, and Branch in Count I.

Allen Cantu was part of Boeing or otherwise not "a separate corporation" which was "free to act independently and advance its own interests contrary to those of" Boeing. *Goldin II,* 219 F.3d at 1277. The mere fact that Allen Cantu was hired to provide Boeing with information cannot alone establish that the two companies were functionally one and the same.

What is lacking in Lockheed Martin's Amended Complaint, however, is any allegation that Allen Cantu ever associated with anyone but Boeing. Lockheed Martin alleges only that Allen Cantu was hired by Boeing to provide Boeing with Lockheed Martin proprietary and confidential information. There is no allegation that Allen Cantu ever joined together with any of the other entities alleged to be part of the association-in-fact. Indeed, there is nothing in Lockheed Martin's Amended Complaint which suggests that Allen Cantu had any relationship whatsoever with Branch, McDonnell Douglas, or Hughes-the only entities alleged in the association-in-fact which were ever arguably distinct from Boeing. As such, Lockheed Martin has failed to sufficiently allege that Allen Cantu was part of a criminal association-in-fact.

With regard to Hughes and McDonnell Douglas, the Court agrees with the Boeing Defendants that there is nothing in Lockheed Martin's Amended Complaint which suggests that Boeing ever associated with the two companies prior to the time that they became subsidiaries of Boeing.[13] Rather, it was only after McDonnell Douglas and Hughes became subsidiaries of Boeing that they allegedly worked on behalf of their parent company to steal the confidential and proprietary information of their competitors. Upon final analysis,

then, Lockheed Martin's second purported criminal association-in-fact alleges that Boeing associated with either its own employees or its own subsidiaries and, therefore, fails to satisfy the distinctness requirement of *Goldin I.* Because each of Lockheed Martin's alleged associations-in-fact fails, Lockheed Martin's claim § 1962(c) claim against the Boeing Defendants must be dismissed.

**B. Defendants' Motions to Dismiss Counts II & V**

Section 1962(a) makes it "unlawful for any person who has received any income, derived directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income . . . [in the] operation of, any enterprise which is engaged in . . . interstate . . . commerce." Lockheed Martin alleges that Defendants violated § 1962(a) by: (1) stealing Lockheed Martin proprietary and confidential information; (2) using that information to win launch contracts with the Government; (3) receiving income from the contracts; and (4) investing that income in Boeing. Defendants argue, first, that Lockheed Martin's Amended Complaint fails to allege facts which, if proven, could establish that they received income which derived from racketeering activity. Defendants' second contention is that Lockheed Martin fails to allege that Defendants invested income in Boeing which resulted in an injury to Lockheed Martin. Both of these arguments are unavailing.

First, it can be reasonably inferred from the facts alleged in Lockheed Martin's Amended Complaint that "but for" the information that Defendants illegally acquired from Lockheed Martin,

---

**13.** Lockheed Martin does not dispute the Boeing Defendants' specific contention that McDonnell Douglas and Hughes did not associate with Boeing prior to being acquired by Boeing, but merely argues that McDonnell Douglas and Hughes were distinct before they were acquired. *See* Doc. 338 at 11 n. 5.

Boeing would not have outbid Lockheed Martin for launch contracts and, thus, would not have received income from the contracts. *See* Doc. 233 ¶ 189 (alleging that "[t]he income received from the pattern of racketeering activity was the income received from the U.S. Government based on the Defendants' theft and use of Lockheed Martin confidential and proprietary information"). Defendants argue that the Government "might have awarded [the] contracts for reasons besides [their] extortive acts." However, to reach this conclusion would require the Court both to weigh the facts and to weigh them in favor of the Defendants. The Court obviously can do neither in reviewing a motion to dismiss.

 Defendants' second argument is even less persuasive than the first. Lockheed Martin clearly alleges both that Defendants invested income from racketeering acts into Boeing and also that Lockheed Martin would not have been injured but for that investment. *See id.* ¶¶ 188–90 (alleging that Defendants "used and invested, directly and indirectly, such income, and the proceeds of such income, in the acquisition of an interest in, or the establishment or operation of, an enterprise, to wit, BOEING" and that such investment injured Lockheed Martin by providing Boeing with an unfair advantage in a number of sub-markets for satellite launch services). Defendants argue that any injury suffered by Lockheed Martin resulted, not from any investment in Boeing, but "from Lockheed Martin's failure to receive the income itself." However, Lockheed Martin's allegations of injury squarely refute Defendants' contention. *See id.* (alleging the following injuries: (1) that Boeing gained an advantage over Lockheed Martin in building a west coast launch pad, thereby preventing Lockheed Martin from obtaining contracts to perform launches for the Government on the west coast; (2) that Boe-

ing gained an advantage over Lockheed Martin in performing launches using heavy-lift launch vehicles thus precluding Lockheed Martin from performing heavy-lift launches; (3) that Boeing gained an advantage over Lockheed Martin in future bidding competitions; (4) that Boeing acquired more resources to innovate its Government launch service offerings; and (5) that Lockheed Martin was forced to reduce its investments in its launch service offerings and to reduce its research and development staff).

Yet, despite the futility of these arguments, Lockheed Martin nevertheless has failed to state a claim under § 1962(a). Lockheed Martin's § 1962(a) claim suffers from two fatal defects. First, Lockheed Martin fails once more to allege a proper enterprise. Second, Lockheed Martin fails to adequately allege an injury which proximately resulted from a violation of § 1962(a).

### 1. § 1962(a) Enterprise

 Unlike a § 1962(c) enterprise, which "generally connotes the vehicle through which the unlawful pattern of racketeering activity is committed," a § 1962(a) enterprise is "something acquired through the use of illegal activities or by money obtained from illegal activities." *N.O.W. v. Scheidler*, 510 U.S. 249, 259, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994). A § 1962(a) enterprise is, in other words, "the victim of unlawful activity," not the vehicle through which that activity is committed. *Id.* Boeing is obviously not a victim. Nor could Defendants have acquired Boeing-they *are* Boeing. *See In re Managed Care Litig.*, 150 F.Supp.2d 1330, 1352 (S.D.Fla.2001) ("Obviously each Defendant is not a victim, nor can it acquire itself."). Thus, under *Scheidler's* definition of a § 1962(a) enterprise, Lockheed Martin's claim fails.

### 2. § 1962(a) Injury

■ In order to have standing to sue for violations of RICO, a plaintiff must allege both "but-for" and proximate causation. *See Cox v. Adm'r United States Steel & Carnegie*, 17 F.3d 1386, 1399 (11th Cir.1994) ("RICO plaintiffs must prove proximate causation in order to recover.") (citing *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 267–68, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992); *N.O.W. v. Scheidler*, 968 F.2d 612 (7th Cir.1992), *rev'd on other grounds*, 510 U.S. 249, 114 S.Ct. 798, 127 L.Ed.2d 99 (1992)). In contrast to the injury requirement under § 1962(c), which may be satisfied by harm alleged to be the result of racketeering activity, a majority of courts that have addressed the issue have determined that a claimant under § 1962(a) must plead an injury which stems not "from the racketeering predicate acts themselves" but from the "use or investment of . . . racketeering income." *Fogie v. THORN Ams., Inc.*, 190 F.3d 889, 895 (8th Cir.1999) (adopting the majority position which limits "standing only to plaintiffs who have suffered injury from the use or investment of the racketeering income") (citing *Vemco, Inc. v. Camardella*, 23 F.3d 129, 132 (6th Cir.), *cert. denied*, 513 U.S. 1017, 115 S.Ct. 579, 130 L.Ed.2d 495 (1994) (limiting standing to plaintiffs suffering injury from use or investment of racketeering income)); *Nugget Hydroelectric, L.P. v. Pac. Gas & Elec. Co.*, 981 F.2d 429, 437 (9th Cir.1992), *cert. denied*, 508 U.S. 908, 113 S.Ct. 2336, 124 L.Ed.2d 247 (1993) (same); *Parker & Parsley Petroleum v. Dresser Indus.*, 972 F.2d 580, 584 & n. 4 (5th Cir.1992) (same); *Glessner v. Kenny*, 952 F.2d 702, 708–10 (3d Cir.1991) (same); *Danielsen v. Burnside–Ott Aviation Training Ctr., Inc.*, 941 F.2d 1220, 1229–30 (D.C.Cir.1991) (same); *Ouaknine v. MacFarlane*, 897 F.2d 75, 82 (2d Cir. 1990) (same); *Grider v. Tex. Oil & Gas Corp.*, 868 F.2d 1147, 1149–51 (10th Cir.), *cert. denied*, 493 U.S. 820, 110 S.Ct. 76, 107 L.Ed.2d 43 (1989) (same). *But see Busby v. Crown Supply, Inc.*, 896 F.2d 833, 836–40· (4th Cir.1990) (holding that plaintiffs can satisfy the injury requirement by alleging injuries which result from the racketeering acts themselves); *see also In re Managed Care Litig.*, 150 F.Supp.2d 1330, 1351 (S.D.Fla.2001) (adopting the Fourth Circuit's position).

■ Among all the circuits that have addressed the issue, the Fourth Circuit stands alone in allowing § 1962(a) claims based on injuries caused by acts of racketeering. The Fourth Circuit rests its divergent position primarily on its interpretation of § 1964(c), the section of RICO which authorizes civil suits for violations of § 1962. Section 1964(c) provides that "[a]ny person injured in his business or property by reason of a violation of Section 1962 . . . may sue therefor." The Fourth Circuit's view, as expressed in *Busby*, is that the "broadly drafted 'by reason of' language in § 1964(c)" permits claims under § 1962(a) based on injuries caused by racketeering acts. 896 F.2d at 838.

The *Busby* court also relied on the Supreme Court's companion decisions in *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), and *American National Bank & Trust Co. of Chicago v. Haroco, Inc.*, 473 U.S. 606, 609, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985), which collectively held that neither a "racketeering injury" nor an injury which flows from the performance of racketeering acts in the conduct of an enterprise is required in claims brought under § 1962(c). *Id.* at 839. Implied in these holdings, according to the Fourth Circuit, was an instruction to apply "a traditional causation analysis in determining whether a RICO plaintiff has been injured 'by reason of' a section 1962 violation," regardless of which subsection of 1962 is alleged to have been violated.

In *Fogie,* the Eighth Circuit rejected *Busby* and joined eight other circuits in adopting the rule restricting standing under § 1962(a) to only those plaintiffs who have alleged an injury from the investment of racketeering proceeds. The court explained its decision to adopt the majority view in the following terms:

First, § 1964(c) allows only persons injured "by reason of" a § 1962 violation to bring a civil suit under RICO. A person injured by predicate racketeering acts . . . is not injured "by reason of" a violation of § 1962(a). Rather, that person is injured by conduct constituting only a predicate act . . . .

Second, if individuals injured only by predicate acts could bring a civil action under § 1962(a), § 1962(c) would be rendered superfluous. Section 1962(c) creates liability for those persons who "conduct or participate . . . in the conduct" of a RICO enterprise. If § 1962(a) were read to allow any person harmed by a predicate act to bring a civil suit under RICO, a defendant could be held liable for violating RICO when that defendant engaged in a predicate act, whether or not that defendant also conducted or participated in the conducting of a RICO enterprise. The restriction of § 1962(c) liability to those in management positions would be meaningless. Reading § 1962(a) so broadly that it renders § 1962(c) meaningless runs contrary to the interpretive canon that statutes should be read to give "each word some operative effect."

190 F.3d at 895–96 (citations omitted).

Although the issue raised here is a difficult one, the majority view, as articulated by the *Fogie* court, rests on the plainest and most reasonable reading of §§ 1962(a) and 1964(c). First, it is the use or investment of racketeering income, not racketeering acts, which violates § 1962(a). Thus, while it is accurate to say that an injury caused by the investment of racketeering income is clearly an injury "by reason of" a § 1962(a) violation, the same may not be said of injuries caused by acts of racketeering. Moreover, to the degree that any ambiguities lie in §§ 1962(a) or 1964(c), they ought to be resolved in favor of an interpretation which avoids rendering, not merely a word or phrase, but an entire subsection of RICO meaningless. Finally, with regard to the *Busby* court's reliance on *Sedima* and *Haroco,* the imposition of a narrower standing requirement for § 1962(a) than § 1962(c) is easily justified by the difference in the precision of the wording employed in the two subsections. In *Sedima* and *Haroco,* the broad language of § 1962(c), requiring that a defendant *conduct or participate in the conduct of an enterprise,* was matched by the court's unwillingness to impose a narrow standing requirement. By contrast, the relatively precise language of § 1962(a), prohibiting the use or investment of racketeering income in an enterprise, provides a firm foundation for a standing requirement tailored to the conduct which the subsection specifically proscribes.

■ The conclusion that Lockheed Martin has failed to adequately allege an injury is not, however, based solely on the Court's adoption of the investment rule. Indeed, Lockheed Martin has pled five different injuries which allegedly derive from Defendants' investment of racketeering income in Boeing. It is, rather, the additional requirement that the investment rule does not "contemplate a channeling of profits" derived from racketeering acts "back to [the] RICO violator" which proves fatal to Lockheed Martin's allegations of injury. *Allstate Ins. Co. v. Seigel,* 312 F.Supp.2d 260, 271 (D.Conn.2004).

Because "§ 1962(a) aims at punishing not the predicate offenses but the investment of the ill-gotten gains of the predicate offenses," "racketeering proceeds

[which] are merely reinvested back into the same RICO enterprise ... derive proximately not from the investment but rather from the predicate acts themselves." *Id.; see also Wagh v. Metris Direct, Inc.,* 348 F.3d 1102, 1110 (9th Cir. 2003) (rejecting appellant's "reinvestment theory" and noting that "[s]everal courts, applying an investment injury requirement, have held that 'the acquisition and reinvestment of the proceeds of racketeering activity in the general affairs of an enterprise' does not qualify as investment injury"); *Vicom v. Harbridge Merch. Servs., Inc.,* 20 F.3d 771, 778 n. 6 (7th Cir.1994) (stating that "the majority view is that the mere reinvestment of the racketeering proceeds into a business activity is not sufficient for § 1962(a) standing"); *Brittingham v. Mobil Corp.,* 943 F.2d 297, 305 (3d Cir.1991) ("The direct cause of plaintiffs' alleged injuries was the fraudulent conduct. Plaintiffs have neither alleged nor demonstrated a connection with the use or investment of racketeering income other than the normal reinvestment of corporate profits."); *Vega v. Contract Cleaning Maint., Inc.,* 2004 WL 2358274, at *12 (E.D.Ill.2004), 2004 U.S. Dist. LEXIS 20949, at *41 ("Courts have also held that plaintiffs must plead a different injury from the injury caused by the mere reinvestment of racketeering proceeds into a business activity."); *USA Certified Merchants, LLC v. Koebel,* 262 F.Supp.2d 319, 331 (S.D.N.Y.2003); *Falise v. Am. Tobacco Co.,* 94 F.Supp.2d 316, 349–50 (E.D.N.Y. 2000) ("Where reinvestment of racketeering proceeds back into the same RICO enterprise is alleged, the injuries stem proximately not from the investment, but from the predicate acts that make up the racketeering activity."). The reasoning of the Third Circuit in *Brittingham* is particularly persuasive. Facing facts similar to those in this case, the court observed that:

> Over the long term, corporations generally reinvest their profits, regardless of

the source. Consequently, almost every racketeering act by a corporation will have some connection to the proceeds of a previous act. Section 1962(c) is the proper avenue to redress injuries caused by the racketeering acts themselves. If plaintiff's reinvestment injury concept were accepted, almost every pattern of racketeering activity by a corporation would be actionable under § 1962(a), and the distinction between § 1962(a) and § 1962(c) would be meaningless.

943 F.2d at 305.

This Court is similarly unwilling to allow § 1962(a) claims to function as an end-run around § 1962(c) and, accordingly, adopts "the majority view" that the "mere reinvestment of the racketeering proceeds into a business activity is not sufficient for § 1962(a) standing." *Vicom,* 20 F.3d at 778 n. 6. Application of this standard to the facts of this case is straightforward. The only injuries claimed by Lockheed Martin are alleged to be the result of Defendants' investment in Boeing and are, therefore, prime illustrations of "reinvestment" injuries. Hence, Lockheed Martin's § 1962(a) claim fails for the additional reason that it does not properly allege an investment injury.

**D. Defendants' Motions to Dismiss All RICO Counts for Failure to Properly Allege Predicate Acts**

All claims brought under § 1962 must allege "a pattern of racketeering activity." *See H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 232, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). " 'Racketeering activity' is defined in RICO to mean 'any act or threat involving' specified state-law crimes, any 'act' indictable under various specified federal statutes, and certain federal 'offenses.' " *Id.* (citations omitted). A pattern of racketeering activity consists of " 'at least two acts of racketeering activity' within a 10–year period." *Id.*

Lockheed Martin has alleged a pattern of racketeering activity which includes "an act of bribery which is chargeable under state law and punishable by imprisonment for more than one year and multiple acts indictable under 18 U.S.C. §§ 1341 (relating to wire fraud), 1343 (relating to mail fraud), 1503 (relating to obstruction of justice), 1512(b)(2)(B) (relating to tampering with a witness, victim or informant), and 2314 and 2315 (relating to interstate transportation of stolen property)." Doc. 233 ¶ 59 (alleged as Predicate Acts A, C, D, E, F, G, H, I, J, K). According to Lockheed Martin, "[t]he victims of this pattern of racketeering activity include[ ] not only Lockheed Martin, but also other corporations including General Dynamics, Martin Marietta, Raytheon, AssureStat, and [Government] agencies including the [Air Force], NASA, and the Missile Defense Agency." *Id.* Defendants contend that Lockheed Martin fails to adequately plead any of its alleged predicate acts. As explained below, Lockheed Martin has sufficiently pled Predicate Acts H, J, and K and, therefore, has succeeded in pleading a pattern of racketeering activity. Thus, the grounds for dismissing Lockheed Martin's § 1962(a) and § 1962(c) claims against the Boeing Defendants and its § 1962(a) claim against Satchell are limited to the reasons stated earlier in this order. However, because Lockheed Martin has adequately pled a pattern of racketeering activity, Satchell's motion to dismiss its claim under § 1962(c) must be denied.

### 1. Lockheed Martin's Allegations of Mail and Wire Fraud

Lockheed Martin alleges that Defendants engaged in seven separate schemes to defraud Boeing's competitors in violation of the mail and wire fraud statutes. Doc. 233 ¶¶ 65–68, 82–174 (alleging Predicate Acts A, D, E, F, G, H, & I). Defendants contend that all of these alleged schemes to defraud are insufficiently pled. Defendants submit that Predicate Acts A, D, E, F, G, and I are inadequately pled because they do not allege that Defendants made any material misrepresentations or omissions. Defendants argue that Predicate Act H fails because it does not properly allege that Lockheed Martin was deprived of an interest in property by virtue of Defendants' alleged scheme to defraud.

### a. Predicate Acts A, D, E, F, G, & I

A violation of the mail or wire fraud statutes occurs "when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the mails or wires in furtherance of that scheme." [14] *McCulloch v. PNC Bank, Inc.,* 298 F.3d 1217, 1225 (11th Cir.2002) (internal citations omitted). Lockheed Martin does not dispute that its allegations of Predicate Acts A, D, E, F, G, & I fail to allege material representations or omissions but contends instead that such allegations are not required for claims of mail and wire fraud.

Contrary to Lockheed Martin's contention, it is clear that in the Eleventh Circuit "[a] scheme to defraud requires proof of material misrepresentations, or the omission or concealment of material facts ... reasonably calculated to deceive persons of ordinary prudence." *Hasson,* 333 F.3d at 1270–71; *see also Neder v. United States,* 527 U.S. 1, 21, 25, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (requiring ele-

---

14. "The elements of mail and wire fraud are identical." *Pelletier v. Zweifel,* 921 F.2d 1465, 1498 (11th Cir.1991) (citing *Carpenter v. United States,* 484 U.S. 19, 25 n. 6, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987)); *see also United States v. Hasson,* 333 F.3d 1264, 1271 n. 7 (11th Cir.2003) ("The 'scheme or artifice to defraud' ... in the mail and wire fraud statutes [is] construed identically.").

ment of materiality under mail and wire fraud statutes in accordance with the "well-established rule of construction that where Congress uses terms that have accumulated settled meaning under ... the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms") (citations and internal quotations omitted); *Pelletier,* 921 F.2d at 1499 ("Mail and wire fraud, just like common law fraud, ... entail '[a]n intention to induce the [victim] to act or to refrain from action in reliance on the misrepresentation.'") (quoting Prosser & Keeton on Torts 728 (5th ed.1984) (reciting the elements of common law fraud)).

 Ignoring *Hasson,* Lockheed Martin rests its argument on *United States v. Falcone,* in which, in a footnote, the court stated the following:

> Courts have read both the mail fraud statute ... and the wire fraud statute ... as forbidding both schemes to defraud that do not involve false pretenses or representations, and schemes to defraud by means of such false pretenses of representations.

934 F.2d 1528, 1539 n. 28 (11th Cir.1991) (citations omitted).[15] Lockheed Martin's reliance on *Falcone* is misplaced. First,

the court in *Falcone* was not faced with a scheme to defraud and thus had no occasion to determine whether a conviction for mail or wire fraud required proof of a material misrepresentation. *See id.* at 1539–47.[16] Thus, quite apart from establishing precedent on the elements of a mail or wire fraud claim, the *Falcone* court was merely describing what it perceived to be the state of the law with regard to an issue which had no immediate bearing on the matter before it. Moreover, to the extent that the *Falcone* footnote might have otherwise served as persuasive authority, that ceased to be true after *Hasson.*

This Court thus concludes that *Hasson* reflects the state of the law on pleading wire and mail fraud in the Eleventh Circuit. Accordingly, because Lockheed Martin's claims of mail and wire fraud fail to allege material misrepresentations or omissions, Predicate Acts A, D, E, F, G, & I are insufficiently pled as RICO predicate acts.

**b. Predicate Act H**

 The Supreme Court has repeatedly made clear that the mail and wire fraud statutes protect "property rights only." *See, e.g., Cleveland v. United States,* 531 U.S. 12, 19, 121 S.Ct. 365, 148 L.Ed.2d 221

**15.** One of the cases cited by the *Falcone* court was *United States v. Scott,* 701 F.2d 1340 (11th Cir.), *cert. denied,* 464 U.S. 856, 104 S.Ct. 175, 78 L.Ed.2d 158 (1983). The court in *Scott* simply determined that the words "devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" should be interpreted in the disjunctive so that the statute "prohibits two separate acts, each constituting an independent ground for prosecution and conviction of mail fraud." *Id.* at 1343. The court reviewed a conviction based on the clause following the disjunctive and thus did not have occasion to review, much less rule on, the issue of whether a scheme to defraud required proof of a material misrepresentation.

**16.** The issue before the court in *Falcone* was whether the evidence was sufficient to sustain defendants' convictions under the federal bank fraud statute. While the bank fraud statute is patterned after the mail and wire fraud statutes, the court was reviewing § 1344(a)(2) which "outlaws schemes to obtain funds in the custody or control of federally insured financial institutions. by means of false or fraudulent pretenses, representations, or promises." 934 F.2d at 1539. The court did not address the first subsection of the bank fraud statute outlawing "schemes to defraud federally insured financial institutions"- the subsection analogous to the clause of the mail and wire fraud statutes which the Court is presently faced with interpreting.

(2000). This includes, however, not just tangible property rights but intangible property rights as well. *Carpenter v. United States,* 484 U.S. 19, 28, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987) ("[T]he object of the scheme was to take the Journal's confidential business information ... and *its intangible nature does not make it any less 'property' protected by the mail and wire fraud statutes.*") (emphasis added); *see also United States v. Poirier,* 321 F.3d 1024, 1030 (11th Cir.2003) (relying on *Carpenter* to reach its conclusion that the appellants' theft and disclosure of confidential business information constituted a deprivation of the victim's property).

Lockheed Martin alleges that, as a result of Defendants' failure to disclose the nature and scope of their wrongdoing, it was deprived of the intangible rights to sue Defendants and to pursue or obtain satellite launch contracts. Defendants contend that a lost opportunity to sue is not a deprivation of money or property and that Lockheed Martin never actually alleged that it was deprived of a right to obtain satellite launch contracts.

First, Defendants' assertion that Lockheed Martin never alleged that it was deprived of the right or opportunity to obtain contracts is incorrect. Lockheed Martin's Amended Complaint states that, by concealing their wrongdoing, Defendants avoided "debarment from U.S. Government contracting ... as well as disqualification from the EELV competition." Doc. 233 ¶ 144. As Lockheed Martin contends, had the Government taken these actions against Defendants, the contracts which formerly had been awarded to Boeing likely would have been reallocated to Lockheed Martin. In this manner, Lockheed Martin has alleged that it was deprived of obtaining contracts to which-both before and after the 1998 EELV competition-it was entitled.

Moreover, the crux of Lockheed Martin's claim with respect to Predicate Act H is that Defendants' concealment of their wrongdoing enabled Defendants to persist in depriving Lockheed Martin of its interests in its own confidential and proprietary information. Viewed in this way, Lockheed Martin's allegation is that it was deprived-not of any specific mode of redress-but, rather, of the fruits of its confidential and proprietary information. It is unnecessary, then, to address whether a right to sue is a property right, because the Court concludes that Defendants' concealment of their wrongdoing effected an ongoing deprivation of Lockheed Martin's interest in its own confidential and proprietary information. *See Poirier,* 321 F.3d at 1030 (finding that a theft of confidential information constituted a deprivation of property). Predicate Act H is, therefore, properly pled.

### 2. Lockheed Martin's Allegation of Bribery (Predicate Act C)

Predicate Act C alleges that Defendants bribed Branch by offering him employment with Boeing in return for Lockheed Martin confidential and proprietary information. In so alleging, Lockheed Martin makes no effort to delineate the elements of bribery nor does it cite to any statute which does so. As such, Defendants argue that Predicate Act C is inadequately pled.

Section 1961(1)(A) defines "racketeering activity" to include "any act or threat involving ... bribery ... which is chargeable under State law and punishable by imprisonment for more than one year." The "references to state law" in § 1961(1)(A) merely "serve a definitional purpose, to identify generally the kind of activity made illegal by the federal statute." *United States v. Salinas,* 564 F.2d 688, 690 (5th Cir.1977), *cert. denied,* 435

U.S. 951, 98 S.Ct. 1577, 55 L.Ed.2d 800 (1978); *see also United States v. Watchmaker*, 761 F.2d 1459, 1469 (11th Cir. 1985), *cert. denied*, 474 U.S. 1100, 106 S.Ct. 880, 88 L.Ed.2d 917 (1986) (references to state law only "serve[ ] to 'indicate the type of serious conduct contemplated by the RICO statute as actionable as an act of racketeering' ") (quoting *United States v. Welch*, 656 F.2d 1039, 1058 (5th Cir.1981)). An allegation of bribery as a RICO predicate act need not "incorporate the common law definition of bribery" nor must it be based on a statute specifically denominated as a "bribery" statute. *United States v. Kotvas*, 941 F.2d 1141, 1145 (11th Cir.1991), *cert. denied*, 506 U.S. 1055, 113 S.Ct. 982, 122 L.Ed.2d 135 (1993) (following *United States v. Garner*, 837 F.2d 1404 (7th Cir.1987), *cert. denied*, 486 U.S. 1035, 108 S.Ct. 2022, 100 L.Ed.2d 608 (1988)).

In *Kotvas*, the court read RICO broadly to permit the Florida Unauthorized Compensation Statute to serve as a basis for an allegation of bribery as a RICO predicate act. *Id.* at 1146. Neither *Kotvas* nor the principle that RICO should be read broadly, however, supports the view that a RICO plaintiff need not reference any statute in alleging a predicate act. The issue here is not, as it was in *Kotvas*, whether the alleged statutory violation is sufficiently similar to one of the generically referenced state law violations in § 1961(1)(A). Rather, it is whether RICO plaintiffs must, at a minimum, put Defendants on notice as to what laws they are alleged to have violated. At least this much is required.

Lockheed Martin's bribery claim illustrates the practical difficulties which would arise were the Court to decide otherwise. Absent a reference to a particular statute, Lockheed Martin's Amended Complaint provides neither the Court nor Defendants any clue as to what elements Lockheed Martin must ultimately prove to establish

a violation or even whether the alleged offense is punishable "for more than one year." *See Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1088 n. 2 (11th Cir.2004) (rejecting "any potential state-law extortion or mail fraud claims as predicate acts" where neither the plaintiff's "complaint nor his appellate briefs identif[ied] any Florida statute that would give rise to a federal RICO violation"). Predicate Act C is, therefore, inadequately pled.

### 3. Lockheed Martin's Allegation of Obstruction of Justice (Predicate Act J)

■ Under 18 U.S.C. § 1503(a), it is illegal for any person to endeavor "to influence, obstruct, or impede the due administration of justice." 18 U.S.C. § 1503(a); *United States v. Aguilar*, 515 U.S. 593, 598, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995). Predicate Act J alleges that Satchell "endeavored to influence, obstruct, and impede the due administration of justice in the Erskine Litigation by giving a false, evasive, and perjurious deposition." Doc. 233 ¶ 175. Boeing is also alleged to have obstructed justice in the Erskine litigation by submitting a false affidavit. *Id.* ¶ 176. Defendants argue that Predicate Act J is insufficiently pled because Lockheed Martin fails to allege facts to support an inference that either the false testimony or false affidavit were given with the purpose of affecting the Erskine litigation.

■ Defendants base their argument on the intent requirement for § 1503 claims. To satisfy this requirement, the alleged "endeavor" to obstruct justice "must have the natural and probable effect of interfering with the due administration of justice." 515 U.S. at 599, 115 S.Ct. 2357. Where "the defendant lacks knowledge that his actions are likely to affect the judicial proceeding, he lacks the requisite intent to obstruct." *Id.*

In this instance, there can be little question that, under the facts as alleged, both Satchell and Boeing knew that there was an ongoing judicial proceeding. This is not a case where alleged wrongdoers merely uttered "false statements to an investigating agent ... who might or might not [have] testif[ied] before a grand jury." As Lockheed Martin points out, it was, after all, Boeing which filed the false deposition testimony and affidavit in the Erskine litigation. Contrary to what Defendants contend, these facts are sufficient to support an inference that Defendants intended to obstruct justice in the Erskine litigation. Predicate Act J is, therefore, sufficiently pled.

### 4. Lockheed Martin's Allegation of Tampering With a Witness (Predicate Act K)

Under 18 U.S.C. § 1512(b)(2)(B), it is illegal for any person to "knowingly use[ ] intimidation, threaten[ ] or corruptly persuade[ ] another person, or attempt[ ] to do so, or engage[ ] in misleading conduct toward another, with intent to ... cause or induce any person to ... alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding." Predicate Act K alleges that "Satchell knowingly and corruptly attempt[ed] to persuade ... Jew ... to destroy ... documents, hard copies, and computer data, containing Lockheed Martin confidential and proprietary information relating to the Lockheed Martin EELV proposal." Defendants contend that Predicate Act K is insufficiently pled because Lockheed Martin fails to allege that Satchell had the requisite state of mind to violate § 1512(b)(2)(B).

Analysis of Defendants' argument begins with § 1512(f)(1), which provides that "an official proceeding need not be pending or about to be instituted at the time of the [§ 1512(b)] offense." While § 1512(f)(1) is clear with regard to what need not be alleged or ultimately proved in a § 1512(b) claim, it has left courts to grapple with the issue of precisely what state of mind an individual must possess to violate the statute. While Defendants do not say what state of mind they believe is required, they point to *United States v. Shively*, wherein the Fifth Circuit stated that a conviction under § 1512 cannot be sustained "[w]ithout at least a circumstantial showing of intent to affect testimony at some particular federal proceeding that is *ongoing or is scheduled to be commenced in the future*." 927 F.2d 804, 812–13 (5th Cir.1991) (emphasis added).

*Shively*, however, has ceased to be of any value in the Fifth Circuit following the court's recent decision in *United States v. Arthur Andersen, LLP,* 374 F.3d 281, 298 (5th Cir.2004), *cert. granted,* —— U.S. ——, 125 S.Ct. 823, 160 L.Ed.2d 609 (2005). In *Arthur Andersen,* the court found that the very language from *Shively* which Defendants rely upon in this case was not only dicta but was also inconsistent with the "plain language" of § 1512(f)(1). *See id.* (noting that its determination that the language from *Shively* was dicta "reconcile[d][it] with the plain language of the statute, an accommodation that we should prefer over a reading that defies the statutory provision that an official proceeding 'need not be pending or about to be instituted at the time of the offense' ").

Consistent with the Fifth Circuit's reasoning in *Arthur Andersen,* the better view is that a violation of § 1512 requires only a reasonable inference that the accused individual feared that "a proceeding had been or might be instituted" and acted on that fear by corruptly "persuading persons with the intent to influence their possible testimony [or to destroy evidence] in such a proceeding." *United States v. Kelley,* 36 F.3d 1118, 1128 (D.C.Cir.1994).

The principal benefit of this standard, as contrasted with the standard suggested by the court in *Shively*, is its adherence to the plain language of § 1512(f)(1). Additionally, by requiring only that there be some fear that a "proceeding might be instituted" and an intent to hide or destroy evidence that could be used in such a proceeding, § 1512 stands to function more effectively as an obstacle to individuals seeking to obstruct justice-which is the very object of the statute. *See United States v. Conneaut Indus.*, 852 F.Supp. 116, 125 (D.R.I.1994) (reasoning that, under a more demanding standard, "law enforcement could be thwarted by a defendant's coercive action against a person that results in the destruction of evidence of criminal conduct that would otherwise be available to law enforcement").[17]

Under the intent standard now adopted, Predicate Act K is clearly pled with the requisite degree of sufficiency. It is certainly a reasonable inference from the facts alleged in Lockheed Martin's Amended Complaint that Satchell feared that the information which he induced Jew to destroy might be used against him and the Boeing Defendants in some future proceeding; and, had this been his fear, it was a rational one indeed.

### 5. Conclusion

In sum, Predicate Acts A, D, E, F, G, and I, alleging mail and wire fraud violations, are inadequately pled because they do not include allegations of either material misrepresentations or omissions. Predicate Act C, alleging bribery, is insufficiently alleged because it does not include a reference to a state statute from which it can be ascertained either what elements

must be satisfied to establish a violation or whether the statute is "punishable by imprisonment for more than one year." Still, by properly pleading Predicate Acts H, J, and K, Lockheed Martin has succeeded in pleading at least two predicate acts and, therefore, a pattern of racketeering activity.

▇▇▇ This determination has no bearing on Lockheed Martin's § 1962(a) and § 1962(c) claims against the Boeing Defendants or its § 1962(a) claim against Satchell, all of which have already been deemed deficient on separate grounds. However, because Satchell's motion to dismiss Lockheed Martin's § 1962(c) claim is based solely on his contention that Lockheed Martin failed to adequately plead a pattern of racketeering activity, his motion to dismiss that claim must be denied.

### D. Defendants' Motions to Dismiss Counts III & VI (Civil Conspiracy Under § 1962(d))

Defendants primarily argue that Lockheed Martin's claim under § 1962(d) must fail because its claims under § 1962(a) and § 1962(c) have failed. Additionally, they argue that Lockheed Martin does not have standing under § 1962(d) because it failed to allege that it was "injured in [its] business or property" by any overt acts committed in furtherance of the alleged conspiracy. The latter argument is without merit. Paragraphs 58–191 of Lockheed Martin's Amended Complaint allege an extensive pattern of racketeering activity and specific injuries resulting therefrom.

The Boeing Defendants are, however, correct in their contention that, because Lockheed Martin's underlying claims have

---

17. This determination does not dispel with a scienter requirement for § 1512 claims. The plain terms of § 1512 as applied to Satchell would require that he *intended* "to ... cause or induce" Jew to "destroy" documents incriminating as to himself and as to the Boeing Defendants with the *"intent* to impair [their] ... integrity or availability for use in an official proceeding."

failed, its conspiracy claim against them must also fail. *See, e.g., Swartz v. KPMG, LLC,* 2004 U.S. Dist. LEXIS 22757, at *29 (W.D.Wash.2004) ("A 'claim for civil conspiracy is entirely dependent on underlying' substantive claims; where 'the underlying claims fail, [the] civil conspiracy claims must also fail.'" (quoting *Oregon Laborers Employers Health & Welfare Trust Fund v. Philip Morris,* 185 F.3d 957, 969 (9th Cir.1999))). Yet, it is under this same logic that Satchell's motion to dismiss Lockheed Martin's § 1962(d) claim must be denied. Because Lockheed Martin's § 1962(c) claim against him has survived, the conspiracy claim against him must also survive.

▉ Dismissal of Lockheed Martin's conspiracy claim against the Boeing Defendants is in no way premised on application of the intracorporate conspiracy doctrine. The Boeing Defendants have not invoked that doctrine as a defense. Moreover, even if they had, the Eleventh Circuit's recent decision in *Kirwin v. Price Communications Corp.,* 391 F.3d 1323 (2004), precludes application of the intracorporate conspiracy doctrine to § 1962(d) claims. Rather, Lockheed Martin's claim under § 1962(d) against the Boeing Defendants fails for the simple reason that "[i]t cannot be that a conspiracy to do a thing is actionable where the thing itself would not be." *Williams v. McClellan,* 59 Misc. 620, 622, 111 N.Y.S. 229 (N.Y.Sup.Ct.1908).

### III. Conclusion

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1. The Boeing Defendants' motion to dismiss Counts I–VI of Lockheed Martin's Amended Complaint (Doc. 289) is **GRANTED** with prejudice.

2. Satchell's motion to dismiss (Doc. 315) is **GRANTED** with prejudice as to Counts II and V of Lockheed Martin's Amended Complaint.

3. Satchell's motion to dismiss Counts I, III, IV, and VI of Lockheed Martin's Amended Complaint (Doc. 315) is **DENIED.**