## In re NATIONAL WESTERN LIFE INSURANCE DEFERRED ANNUITIES LITIGATION.

### No.  05–CV–1018–JLS (LSP).

United States District Court, S.D. California.

June 16, 2009.

Andrew S. Friedman, Elaine A. Ryan, Bonnett Fairbourn Friedman and Balint, Phoenix, AZ, David Lishian Cheng, Ingrid M. Evans, Waters & Kraus LLP, San Francisco, CA, Phong Le Tran, Steven M. Jodlowski, Theodore Joseph Pintar, Coughlin Stoia Geller Rudman & Robbins, LLP, Stephen Richard Basser, Barrack Rodos and Bacine, John J. Stoia, Jr., Lerach Coughlin Stoia Geller Rudman and Robbins, San Diego, CA, William J. Ban, Barrack Rodos & Bacine, Philadelphia, PA, for Plaintiffs.

Larry Mark Golub, Barger and Wolen, Peter H. Mason, Robert W. Fischer, Jr., Spencer Persson, Fulbright and Jaworsky, Los Angeles, CA, for Defendants.

## ORDER: DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

JANIS L. SAMMARTINO, District Judge.

Presently before the Court is Defendant National Western Life Insurance Company's motion for summary judgment. (Doc. No. 104.) Also before the Court are Plaintiffs' amended opposition (Doc. No. 126) and Defendant's reply. (Doc. No. 123.) For the reasons stated below, Defendant's motion is **DENIED**.

## BACKGROUND

Defendant National Western Life Insurance Company "develops, markets, and sells life insurance and annuity products across the United States." (Memo. ISO Motion, at 1.) These sales, however, are not direct. (*Id.*) Instead, Defendant contracts with various National Marketing Organizations ("NMOs"). (*Id.*) These companies "solicit[ ], recruit[ ] and train[ ] the sales agents who ultimately present and sell [Defendant's] deferred annuities to customers." (Opp., at 3.) NMOs are not

under exclusive contract with Defendant; they contract with multiple insurers to market and sell insurance products.[1] (Memo. ISO Motion, at 2.) "From 2000 to the present, NWL has contracted with approximately 165 NMOs in the United States." (*Id.*)

Each NMO has a network of sales agents. (*Id.*, at 2.) These agents are located around the country and actually do the legwork to sell the insurance products offered through the NMOs. (*Id.*, at 1–2.) Agents may be affiliated with more than one NMO. (*Id.*, at 3.)

This market is fraught with competition. (*Id.*, at 2–3.) NMOs compete amongst each other and each agent competes with other agents for sales. (*Id.*) The NMOs "go to great expense to develop proprietary marketing, advertising and sales techniques to enlist sales agents to offer products the NMOs have contracted to offer." (*Id.*, at 2.) Likewise, sales agents can affiliate themselves with multiple NMOs to take advantage of the proprietary information each offers. (*Id.*, at 3.)

Although this marketing industry exists outside of Defendant, National Western still has substantial contact with both NMOs and their agents. (Opp., at 3–8.) For instance, all agents must be approved by Defendant before they can sell Defendant's deferred annuities. (*Id.*, at 4.) Further, agents must "read and follow" Defendant's procedures and regulations "which set[ ] forth the protocol for selling and administering [Defendant's] deferred annuities." (*Id.*) Defendant also requires that its agents take a training course offered by Defendant and sign an acknowledgment form "certifying they have read and will comply with the Company's written materials." (*Id.*) These agents are paid in commissions, "overrides," bonuses,

free conferences, "annuity bonus pools," and deferred compensation plans. (*Id.*, at 6.)

Defendant also remains in regular daily contact with NMOs through its Vice–Presidents "to ensure NMOs remain interested in promoting National Western deferred annuity products." (*Id.*, at 5.) Some of the other contact includes "home office training to new NMOs ..., and ... marketing and advertising subsidies ... when needed." (*Id.*) Defendant works with NMOs "to design new annuity products, ... develop marketing strategies," and conduct "advisory boards" made up of NMOs and agents to "advise [Defendant's] management on ways to improve its annuity products." (*Id.*, at 5–6.) Defendant refers to these activities, along with other contact, as customer service. (Reply, at 6.)

Defendant also imposes "strict production requirements" on NMOs and their agents. "NMOs are expected to generate at least $10 million in ... premium each year or face termination for inadequate production." (Opp., at 6.) Sales agents' performance is reviewed on a quarterly basis. (*Id.*, at 7.) Defendant requires agents to use advertising and marketing it generates, or to submit alternative materials for review and approval. Finally, sales agents selling Defendant's products must used Defendant's standardized forms, though Defendant states that these forms are required under most states' laws. (*Id.*, at 7–8; Reply, at 8.)

## LEGAL STANDARDS

### A. Summary Judgment

Federal Rule of Civil Procedure 56 permits a court to grant summary judgment where (1) the moving party demonstrates

---

1. According to Defendant, "many NMOs that offer [its] products are owned by NWL's competitors, and those NMOs offer both the com-  petitor insurer's products and the products of other insurers." (Memo. ISO Motion, at 3.)

the absence of a genuine issue of material fact and (2) entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Material," for purposes of Rule 56, means that the fact, under governing substantive law, could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). For a dispute to be "genuine," a reasonable jury must be able to return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. The movant can carry its burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party "failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* at 322–23, 106 S.Ct. 2548. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987).

Once the moving party establishes the absence of genuine issues of material fact, the burden shifts to the nonmoving party to set forth facts showing that a genuine issue of disputed fact remains. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. The nonmoving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings." *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. However, the court must draw any factual inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## B. Racketeer Influenced and Corrupt Organizations Act

The Racketeer Influenced and Corrupt Organizations Act (RICO) "provides a private civil action to recover treble damages for injury 'by reason of a violation of' its substantive provisions." *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 481, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1974). Plaintiffs allege that Defendant violated 18 U.S.C. § 1962(c). That provision reads:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). "A violation of § 1962(c) ... requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima,* 473 U.S. at 496, 105 S.Ct. 3275.

An "enterprise," for purposes of this section, is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Under this definition, an enterprise can be a single individual, partnership, corporation, association, or other legal entity. *Odom v. Microsoft Corp.,* 486 F.3d 541, 548 (9th Cir. 2007) (en banc). The type of enterprise alleged here is an "associated-in-fact" enterprise. In *United States v. Turkette,* the Supreme Court defined an associated-in-fact enterprise as "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). "To establish the existence of such an enterprise, a plaintiff must provide both 'evi-

dence of an ongoing organization, formal or informal,' and 'evidence that the various associates function as a continuing unit.'" *Odom,* 486 F.3d at 552 (quoting *Turkette,* 452 U.S. at 583, 101 S.Ct. 2524).

## ANALYSIS

■ Defendant raises a single issue in support of its summary judgment motion: whether Plaintiff has sufficient facts to establish that Defendant, its NMOs, and the sales agents share a "common purpose." (Memo. ISO Motion, at 4–10.) Defendant argues that "independent businesses and competitors cannot share a common purpose." (*Id.,* at 5.) NMOs compete against each other to maximize their own revenue. (*Id.,* at 6.) Agents vie amongst themselves for sales, and "attempt[ ] to maximize sales at the expense of other agents." (*Id.*) Both NMOs and agents sell products other than those offered by Defendant, and Defendant "competes vigorously with other insurers for the services of the NMOs and agents." Given this marketplace environment, Defendant argues that there can be no associated-in-fact enterprise as a matter of law. (*Id.,* at 4–5.)

The Court disagrees. An associated-in-fact enterprise must have "a common purpose of engaging in a course of conduct." *Turkette,* 452 U.S. at 583, 101 S.Ct. 2524. Courts interpret the phrase "common purpose" according to its plain meaning. *See, e.g., Odom,* 486 F.3d at 552 (finding the alleged "common purpose of increasing the number of people using Microsoft's Internet Service" sufficient); *Three Rivers Provider Network, Inc. v. Meritain Health, Inc.,* No. 07–CV–1900 WQH (BLM), 2008 WL 2872664, at *14 (S.D.Cal. July 23, 2008) (alleged common purpose of "defraud[ing] Plaintiff out of fees and convert[ing] Plaintiff's network of discounts"); *Alves v. Players Edge, Inc.,* No. 05–CV1654 WQH (CAB), 2007 WL 6004919, at *11 (S.D.Cal. Aug. 8, 2007) (common pur-

pose of defrauding persons through an illegal betting scheme). This is the obvious approach given the Supreme Court's direction that "RICO is to 'be liberally construed to effectuate its remedial purposes.'" *Sedima,* 473 U.S. at 497, 105 S.Ct. 3275 (quoting Pub. L. 91–452, § 904(a), 84 Stat. 947).

■ The common purpose element, however, does not require the enterprise participants to share all of their purposes in common. *See, e.g., Odom,* 486 F.3d at 552 (finding a single common purpose sufficient). And all members of the enterprise need not be directly working with all other members of that enterprise. *See United States v. Feldman,* 853 F.2d 648 (9th Cir.1988). "What RICO does require as a showing of common purpose is 'proved by evidence of an ongoing organization, formal or informal, and evidence that the various associates function as a continuing unit.'" *Id.,* at 657 (quoting *Turkette,* 452 U.S. at 583, 101 S.Ct. 2524). That is to say, Plaintiff "must ... show the existence of an organization among the various [participants] and show that the organization has some continuity." *Id.*

In this case, Plaintiffs have set forth sufficient evidence to survive summary judgment. Most of these facts are undisputed. (Reply, at 7 ("Indeed, plaintiffs' additional facts are largely undisputed by NWL.").) Plaintiffs claim that Defendant, the NMOs, and the agents "share the common purpose to sell National Western deferred annuities." (Opp., at 13.) As discussed above, there is significant factual support for their claimed common purpose. Primarily, the NMOs and agents sell Defendant's products. This relationship involves more than mere sales, as Defendant exerts control over NMOs and agents through, *inter alia,* agent screening, training, marketing, bonuses, commissions, and performance review. Moreover, Defen-

dant works with NMOs and agents to ensure that its products get sold through advisory boards and other solicited input.

Nothing about this hub and spoke structure precludes a finding of common purpose as defined by *Turkette.* Defendant, however, claims that all of the members of an association-in-fact enterprise must be cooperating with all other members of that enterprise to have a "common purpose"; in this case, that would mean that all agents are working together cooperatively. This is simply incorrect. Courts have clearly held that organizations such as this *can* have a common purpose. *See In re Countrywide Fin. Corp. Mortgage Mktg. & Sales Practices Litig.,* 601 F.Supp.2d 1201, 1212–13 (S.D.Cal.2009). And Plaintiff's evidence creates a genuine issue of material fact as to whether there is a common purpose within the structure in this case.

Neither of Defendant's two arguments to the contrary sway this conclusion. First, Defendant asserts that "[c]ourts that have addressed associated-in-fact enterprises under similar circumstances have held that ... independent businesses and competitors cannot share a common purpose." (*Id.,* at 5.) It cites three district court cases from outside the Ninth Circuit to prove this point. None of these cases, however, compel the result Defendant seeks.

Defendant first cites *Lockheed Martin Corp. v. Boeing Co.,* 357 F.Supp.2d 1350 (M.D.Fla.2005). In *Lockheed,* the plaintiff brought RICO claims against a competitor based on allegations of misuse of confidential information. *Lockheed,* 357 F.Supp.2d at 1355–57. There were four "associated-in-fact" RICO enterprises alleged, including two "legitimate association-in-fact enterprises." *Id.,* at 1358–59. According to the plaintiff, all of the competitors bidding for a contract with the National Aeronautics and Space Administration ("NASA")

along with NASA itself and the United States Air Force formed legitimate associations-in-fact "for the common purpose of designing, proposing, and building the most innovative EELV systems for the Government at the best value." *Id.* The court found that these were not associations in fact. *Id.,* at 1360–65. It noted that these competitors were not "associated" because each they were "acting *independently* to secure the business of a third party." *Id.,* at 1361–62, 1363–64 (quoting Merriam–Webster's Collegiate Dictionary (10th ed. 1999) (defining competition)) (emphasis in original). Thus the court rejected the defendant's claim because "to meet [the "common purpose"] requirement, [the plaintiff] must allege, not only that there was some commonly shared purpose among Boeing and its competitors, but also that they *associated together* for that purpose." *Id.,* at 1362 (emphasis in original).

*Lockheed,* however, bears little resemblance to this case. The enterprise participants in Lockheed were all competitors in a highly limited market. *Id.,* at 1355–57. They did not sell a common product, or collaborate in order to acquire NASA's business. *Id.,* at 1362. The contracts on which they were bidding were only available from NASA and the market was limited to instances where NASA chose to seek bids on projects. In contrast, all of the parties in the alleged enterprise here sell Defendant's products. (Memo. ISO Motion, at 1–2.) Even if NMOs and agents compete amongst themselves, they all worked with Defendant to sell Defendant's annuities. (*Id.*) Moreover, the market here is substantially different from the one in Lockheed. There are millions—if not tens of millions—of consumers who might buy deferred annuities, whereas there is only one NASA putting projects out for competitive bid. The Lockheed court recognized this, stating: "This is not to suggest that competitors can never 'associate'

or 'join together.' Rather, not only is it theoretically possible, but it is something that, as a practical matter often occurs." *Lockheed*, 357 F.Supp.2d at 1363 n. 9.

Next, Defendant cites to the unpublished opinion in *El–Issa v. Compaq Computer Corp.*, No. 97 C 5839, 1997 WL 790730 (N.D.Ill. Dec. 19, 1997). In *El–Issa*, the plaintiff claimed that Compaq advertised free lifetime technical support for their computers but then charged for technical support telephone calls. *Id.*, at *1. The alleged associated-in-fact enterprise consisted of the defendant and its retail partners. *Id.*, at *3. The court rejected the plaintiffs' claims because they "failed to properly allege that the retailers formed an 'enterprise' under RICO." *Id.* As alleged, the organization "lack[ed] the necessary structure." *Id.* The retailers did not share any common goal because "the end result of the [alleged] goal [did] not further the interests of the enterprise as a group." *Id.*

*El–Issa* is also unpersuasive because it is based on Seventh Circuit precedent requiring "that there be 'some' kind of ascertainable structure, but it does not require that it be a separate structure." *Odom*, 486 F.3d at 550 (citing *Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 644 (7th Cir.1995)); *El–Issa*, 1997 WL 790730, at *2–*3. The Ninth Circuit has rejected the idea that an associated-in-fact enterprise must have a particular organizational structure. *Odom*, 486 F.3d at 551. In light of this rejection, *El–Issa* is not good law in the Ninth Circuit, and does not demonstrate that summary judgment is warranted.

The final case Defendant cites in support of its position is *In re Insurance Brokerage Antitrust Litig.*, Civ. Nos. 04–5184(GEB), 05–1079(GEB), 2007 WL 2892700 (D.N.J. Sept. 28, 2007). The plaintiffs in *Insurance Brokerage* alleged that the defendants "misled [Plaintiffs] into thinking that [Plaintiffs were] receiving the most economical and appropriate insurance products, while in fact, Broker [Defendants were] steering [Plaintiffs] towards products that ... maximize[d] the profit of ... Defendants." *Id.*, at *2. Individual insurance brokers would solicit fictitious quotes from two insurance companies. *Id.*, at *17. The first would be from a "preferred" company "at the targeted premium and policy terms demanded by the broker." *Id.* The second would be a "phony" quote on non-competitive terms, "used to ensure that the [first] carrier would get its policy renewed." *Id.* The payback, allegedly, for the second quote was an opportunity to later be the "preferred" insurer. The court primarily resolved and dismissed the plaintiffs' claims because their "pleadings [did] not contain any actual facts suggesting that Insurer–Defendants were interrelated," i.e. they did not adequately allege organizational structure. *Id.*, at *26. The court was following Third Circuit precedent requiring "some sort of structure exists within the group for the making of decisions, whether it be hierarchical or consensual." *United States v. Riccobene*, 709 F.2d 214 (3rd Cir.1983). "Plaintiffs' facts [made] it apparent that each Insurer–Defendant was an *ad hoc* participant in each ... transaction" and that the "Insurer–Defendants ... were seeking to benefit themselves only and neither intended nor created any interdependencies amongst themselves." *Id.*, at *22. Ultimately, the allegations of a common goal were "the goal of increasing one's own profit" and "the mere observation that all transactions followed, more or less, the same conceptual format." *Id.* The court found this was, at most, an industry practice, and not a sufficient common goal. *Id.*

As in *El–Issa*, the *Insurance Brokerage* court relied on circuit precedent requiring organizational structure. *Id.*, at *20–*22.

As previously discussed, the Ninth Circuit has explicitly rejected this organizational structure requirement. *Odom*, 486 F.3d at 551. Second, even if the Court were to ignore the organizational structure basis for the decision, it is still plainly distinguishable. The *Insurance Brokerage* plaintiffs alleged an indefinite number of ephemeral ad-hoc enterprises created by the insurance broker and involving multiple insurance companies. *Insurance Brokerage*, 2007 WL 2892700, at *22. In this case, there was only one alleged enterprise, created by Defendant, with substantially more permanence and awareness than in *Insurance Brokerage*. Given all of the differences between this case and *Insurance Brokerage*, its reasoning is unpersuasive here.

In contrast to these plainly distinguishable cases, courts in this Circuit have found common purpose in precisely the type of organizational structure that Defendant readily admits exists. In re *Countrywide*, 601 F.Supp.2d at 1212–13. That is, having this hub and spoke organization does not preclude a finding of common purpose. *Odom*, 486 F.3d at 551. In light of this, the Court is unpersuaded by Defendant's suggestion that because NMOs and agents compete amongst themselves, they cannot have a common purpose.

Defendant's second argument in favor of summary judgment is that the common purpose requirement of a RICO associated-in-fact enterprise should be interpreted in the same way as the unity of purpose requirement under the Sherman Act. (Memo. ISO Motion, at 9.) Defendant argues that "if competitors are acting competitively—i.e., acting independently and without cooperating or communicating—then there is no common purpose or unity purpose." (*Id.*) This appeal to the Sherman Act is misplaced.

Cases interpreting the Sherman Act have not held that competitors can never have a common purpose. A violation of the Sherman Act requires a plaintiff to prove a contract, combination, or conspiracy in restraint of trade. 15 U.S.C. § 1. This must be proven by "evidence that 'tends to exclude the possibility' that the alleged conspirators acted independently." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). So long as purported "competitors" have this unity of purpose, they can be liable under the Sherman Act.

■ Where the Sherman Act requires a contract, combination, or conspiracy, a RICO violation requires an "enterprise." 18 U.S.C. § 1962(c). This enterprise can be a single individual, partnership, corporation, association, or other legal entity. *Odom*, 486 F.3d at 548. In contrast, section 1 of the Sherman Act requires multiple separate entities to find a violation. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). This structural difference cuts strongly against interpreting the two statutes in the same way. As does the directive that "RICO is to 'be liberally construed to effectuate its remedial purposes.'" *Sedima*, 473 U.S. at 497, 105 S.Ct. 3275 (quoting Pub.L. 91–452, § 904(a), 84 Stat. 947).

Further, there is no precedent for importing standards from the Sherman Act to adjudicate the question at hand. Defendant admitted at oral argument that it knows of no decisions based on the theory it advocates here. Although such precedent is not strictly necessary, given the numerous decisions under each statute, if these standards were the same there would be decisions to that effect. Given the differences in these statutory schemes, and the lack of case law in its support, the Court finds that this argument is meritless.

**1178**

Reading the plain language of RICO, along with relevant Ninth Circuit and Supreme Court precedent, it is clear that Defendant's summary judgment motion must be **DENIED.** The competition among NMOs and among agents is not a barrier to finding that those same NMOs and agents share a common purpose with Defendant. Plaintiffs' evidence creates a genuine issue of material fact as to whether the alleged participants in the RICO conspiracy share a common purpose. Therefore, the Court **DENIES** Defendant's motion.

### CONCLUSION

For the reasons stated, Defendant's motion for summary judgment is **DENIED.**

IT IS SO ORDERED.